UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2020 AUG 11  PM 4: 30

CLERK

BY _____
DEPUTY CLERK

KAREN S.,                                        )
        Plaintiff,                              )
                                )
        v.                                          )      Case No. 2:18-cv-00099
                                )
COMMISSIONER OF SOCIAL SECURITY,   )
                                )
        Defendant.                           )

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR REMAND, DENYING PLAINTIFF'S MOTION FOR JUDGMENT REVERSING THE COMMISSIONER, AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM
(Docs. 12, 18, 22)

Plaintiff Karen Serricchio is a claimant for Social Security Disability Insurance Benefits ("DIB") under the Social Security Act and brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the "Commissioner") that she is not disabled. (Doc. 12.) The Commissioner moves to affirm. (Doc. 18.)

Plaintiff identifies the following errors in Administrative Law Judge ("ALJ") Edward Malvey's August 24, 2017 decision: (1) the ALJ erred in finding Plaintiff's bilateral carpal tunnel syndrome, trigger fingers, and osteoarthritis were not severe medically determinable impairments; (2) the ALJ erred in relying on the opinions of state agency consultants Geoffrey Knisely, M.D. and Elizabeth White, M.D.; (3) the ALJ misinterpreted the law regarding the "duration" requirement in finding that Plaintiff does not have severe medically determinable physical impairments that would be expected to last twelve months; (4) the ALJ failed to properly evaluate the May 11, 2017 Medical Source Statement of Alexandra Scarlett, M.A., Plaintiff's treating therapist; (5) the ALJ erred in his reliance upon erroneous vocational expert ("VE") testimony; (6) the ALJ mischaracterized Plaintiff's current work as substantial gainful activity; and (7) the ALJ

erred in not accepting Plaintiff's post-hearing memorandum.

In addition, Plaintiff moves for a remand to the Appeals Council to act on her August 1, 2018 request that her case be heard before a properly appointed ALJ following the Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), in which the Court held that Securities and Exchange Commission ("SEC") ALJs are subject to the Appointments Clause of the United States Constitution. (Doc. 22). In the alternative, Plaintiff seeks an adjudication on the merits of her Appointments Clause challenge. The Commissioner opposes Plaintiff's motion for remand on the grounds that Plaintiff did not timely raise her Appointments Clause challenge before the Social Security Administration ("SSA") or, in the alternative, has not timely asserted it in this lawsuit and has thus forfeited it. Plaintiff replied to this motion on June 19, 2020. On June 28, 2019, the Commissioner filed a sur-reply, at which time the court took the pending motions under advisement.

Plaintiff is represented by Alexandra M. Jackson, Esq., Francis M. Jackson, Esq., and Tamara N. Gallagher, Esq. The Commissioner is represented by Special Assistant United States Attorney Kristina D. Cohn.

## I.     Factual and Procedural Background.

Plaintiff filed her application for DIB on March 8, 2016 alleging she had the following impairments as of January 10, 2016: golfer's elbow, carpal tunnel syndrome and arthritis in her hands, Post-Traumatic Stress Disorder ("PTSD"), and depression. The SSA denied her request initially and on reconsideration. Plaintiff timely requested a hearing before an ALJ, which took place on May 12, 2017 before ALJ Malvey. Plaintiff appeared at the hearing and testified, as did VE Warren D. Maxim. ALJ Malvey issued an unfavorable decision on August 24, 2017. Plaintiff filed exceptions to ALJ Malvey's decision with the Appeals Council on October 3, 2017. The Appeals Council denied review on April 25, 2018. As a result, ALJ Malvey's disability determination stands as the Commissioner's final decision.

The Supreme Court decided *Lucia* on June 21, 2018. That same day, Plaintiff filed a motion for leave to proceed *in forma pauperis* in this court. After the court granted

Plaintiff's motion, Plaintiff filed a Complaint on July 5, 2018, which did not raise a challenge to the constitutionality of ALJ Malvey's appointment. On July 16, 2018, the Commissioner ratified the appointments of SSA ALJs and sent an emergency message indicating that if a claimant "files a timely Appointments Clause challenge and timely requests Appeals Council review," the Appeals Council should "consider the challenge in the context of the facts of the case (including, but not limited to, the date of the ALJ decision and the date the challenge was raised) in determining whether there is a basis to grant review." EM-18003 Rev 2, as amended Aug. 6, 2018. "[W]here a timely Appointments Clause challenge to an ALJ decision issued prior to July 16, 2018 is raised to the Appeals Council in a proper request for review," the Appeals Council announced it "will grant review and issue a decision or order remand, as appropriate." *Id.*

On August 1, 2018, Plaintiff sent a letter to the Appeals Council requesting it reconsider her appeal and objecting to ALJ Malvey's appointment:

> Please reconsider your denial in this case. In addition to the issues raised in my September 28, 2017 appeal letter, I must also object that the Administrative Law Judge, Judge Malvey, was not properly appointed and thus did not have authority to preside over this case or to issue an unfavorable decision. See Lucia v. SEC, __ U.S. __, 138 S. Ct. 2044 (2018). As explained in Lucia, a new hearing must be held before a different ALJ, properly appointed.
>
> Given this fact, please consider this objection and extend the time to file in Federal Court until you act on this issue.

(Doc. 22-1 at 1.) According to Plaintiff, the Appeals Council has not responded to her request.

On March 15, 2019, the SSA issued a policy ruling regarding the impact of *Lucia* on cases pending before the Appeals Council. *See* SSR 19-1p, 2019 WL 1324866 (Mar. 15, 2019). For claimants who challenged the appointment of the ALJ while their cases were pending, the Appeals Council will "conduct a new and independent review of the claims file and either remand the case to an ALJ other than the ALJ who issued the decision under review, or issue its own new decision about the claim covering the period before the date of the ALJ's decision." *Id.* at *3.

3

In her motion to reverse and opposition to the Commissioner's motion to affirm, Plaintiff did not initially raise an Appointments Clause challenge. On May 16, 2019, Plaintiff filed a separate motion to remand, raising her constitutional challenge to ALJ Malvey's appointment[1] for the first time in federal court.

## II.    ALJ Malvey's August 24, 2017 Decision.

In order to receive disability benefits under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation process determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citations omitted). Although "[t]he claimant has the general burden of proving that he or she has a disability within the meaning of the [SSA], and bears the burden of proving his or her case at [S]teps [O]ne through [F]our[,]" the burden shifts back to the Commissioner at Step Five "to show there is other work that [the claimant] can perform." *Id.* (citations and internal quotation marks omitted).

ALJ Malvey determined that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2020. At Step One, he found Plaintiff has engaged in substantial gainful activity since her alleged onset date of January 10, 2016 because approximately two months prior to the hearing on March 1, 2017, Plaintiff began working full time at Soundview Paper in Putney, Vermont, packaging paper towels, working alternating shifts of thirty-six and forty-eight hours per week at $11.00 per hour.

---

[1] Plaintiff's motion for remand challenges the appointments of both ALJ Malvey and ALJ Thomas Merrill, although the latter does not appear to be involved in her case.

4

In response to Plaintiff's argument that this work constituted trial work under 20 C.F.R. § 404.1592, the ALJ stated that "a trial work period cannot begin until after an individual is found to be disabled" and that he ultimately did not find Plaintiff disabled. (AR 13.)

ALJ Malvey further observed that Plaintiff reported she performed light cooking and prep work for ten hours per week during the period of October of 2016 through January of 2017 at Delightfully Delicious and performed light kitchen duties ten hours per week from October of 2016 through the date of the hearing for Harmonyville Store. He concluded that this part-time work through January of 2017 did not rise to the level of substantial gainful activity due to the "limited nature" of her work activity, and he therefore elected to proceed with the remaining steps in the sequential disability analysis. *Id.* The ALJ did not address evidence that Plaintiff told Occupational Therapist Wendy Stone ("OT Stone") that in February of 2017 she was working twenty hours per week at Harmonyville Store making sandwiches or that she worked full time as a cook/baker at the Dutton Farm Stand until January of 2016 and stopped working there due to a dispute with her employer.

At Step Two, ALJ Malvey found Plaintiff had the following severe impairments: affective disorder, PTSD, anxiety disorder, and attention deficit hyperactivity disorder. Plaintiff alleges that the ALJ neglected to find the following additional impairments severe: bilateral carpal tunnel syndrome, trigger fingers, recurrent left elbow epicondylitis, osteoarthritis, and degenerative changes in her hands and left shoulder. With regard to these impairments, ALJ Malvey determined that "the record fails to reveal evidence of any medically determinable physical impairment that has resulted in any significant limitation in her ability to perform basic work activities for any consecutive [twelve]-month period so as to meet the criteria for a 'severe' impairment as defined by the Act" because Plaintiff's medical records "fail[] to reveal evidence of medically documented objective findings and/or a treatment history consistent with the alleged severity of her symptoms and limitations, while evidence of record with regard to her ongoing level of activity is also found to be inconsistent with her alleged degree of functional limitation." *Id.* at 14.

5

At Step Three, ALJ Malvey concluded Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. He determined that Plaintiff had only moderate limitations in her ability to understand, remember, and apply information; moderate limitations in her ability to interact with others; moderate limitations in her concentration, persistence, and pace; and mild to moderate limitations in her ability to adapt and monitor herself.

At Step Four, ALJ Malvey assessed the following Residual Functional Capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is able to perform simple, routine, repetitive tasks, but not in a production rate environment. She is capable of occasional interaction with supervisors, co-workers[,] and the general public and able to make simple work-related decisions.

*Id.* at 20.

Based on Plaintiff's RFC, ALJ Malvey concluded Plaintiff could return to her past relevant work as a prep cook and sandwich maker because "[t]his work does not require the performance of work-related activities precluded by" her RFC. *Id.* at 24. In reaching this conclusion, he relied on VE Maxim's testimony that an individual with the same vocational profile and RFC as Plaintiff, including an assessed capacity for medium exertional work, could work as a prep cook or sandwich maker as those occupations are generally performed. As a result, the ALJ found that Plaintiff was not disabled from January 10, 2016 through August 24, 2017, the date of his decision.

## III. Whether to Remand Plaintiff's Case to the Appeals Council to Decide Her Appointments Clause Challenge.

Because a decision to remand to the Appeals Council would moot the remainder of Plaintiff's appeal, the court addresses Plaintiff's Appointments Clause challenge first. Plaintiff contends that her August 1, 2018 request to the Appeals Council for reconsideration was a timely Appointments Clause challenge because the Appeals

6

Council retains and exercises jurisdiction over claimants' cases after it denies review. Plaintiff further argues that this court could choose to adjudicate the merits of her challenge pursuant to Sixth Circuit precedent. The Commissioner opposes remand, arguing that Plaintiff did not timely raise an Appointments Clause challenge before the SSA or in this court and has thus forfeited it.

Pursuant to the Appointments Clause of the United States Constitution, Congress may require that "inferior Officers" be appointed by the President, the "Courts of Law," or the "Heads of Departments." U.S. CONST. ART. II § 2, cl. 2. "[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred." *Ryder v. United States*, 515 U.S. 177, 182-83 (1995). The "'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official" or the "Commission itself[.]" *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 183).

The Commissioner does not contest that SSA ALJs are inferior officers subject to the Appointments Clause but points out that Plaintiff forfeited her Appointments Clause challenge by failing to timely raise it before the ALJ or the Appeals Council because such challenges are considered "nonjurisdictional." *Freytag v. C.I.R.*, 501 U.S. 868, 878 (1991) (exercising "its discretion to consider nonjurisdictional claims that had not been raised below" in deciding an Appointments Clause challenge); *see also N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 794 (8th Cir. 2013) (noting the "Supreme Court, the D.C. Circuit, and the Sixth Circuit . . . have all characterized appointments clause challenges as nonjurisdictional"). Depending on the context, an Appointments Clause challenge may therefore be forfeited if not timely made. *See, e.g., Kabani & Co., Inc. v. SEC*, 733 F. App'x 918, 919 (9th Cir. 2018) (holding petitioners "forfeited their Appointments Clause claim by failing to raise it in their briefs or before the [Public Company Accounting Oversight Board]") (memorandum); *N.L.R.B.*, 734 F.3d at 798 (holding the plaintiff "waived its challenge to the Board's composition because it did not

7

raise the issue before the Board").[2]

The Supreme Court has not directly addressed forfeiture of Appointments Clause challenges in the SSA context. However, in *Sims v. Apfel*, 530 U.S. 103, 107 (2000), the Court examined whether "to obtain judicial review of an issue, [a claimant] . . . must specify that issue in his request for review by the [SSA's Appeals] Council." *Id.* A plurality held that claimants are not required to raise issues before the Appeals Council to preserve them for judicial review because issue exhaustion is not mandated by statute and because SSA proceedings are not sufficiently adversarial to compel a judicially imposed exhaustion requirement. *See id.* at 109 ("[T]he desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding."). Writing for the plurality, Justice Thomas observed:

> Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits, and the Council's review is similarly broad. The Commissioner has no representative before the ALJ to oppose the claim for benefits, and we have found no indication that he opposes claimants before the Council.

*Id.* at 110-11 (internal citations omitted). The plurality further found that SSA regulations characterized Appeals Council proceedings as plenary and the Commissioner's role as an adviser to the Council in selecting cases to review *sua sponte*. The regulations therefore "strongly suggest[] that the Council does not depend much, if at all, on claimants to identify issues for review." *Id.* at 112.

In holding that issue exhaustion before the Appeals Council is not required to preserve arguments for judicial review, the *Sims* court noted that "[w]hether a claimant

---

[2] *See also Jones Bros., Inc. v. Sec. of Labor*, 898 F.3d 669, 677 (6th Cir. 2018) (finding the plaintiffs forfeited their Appointments Clause challenge by "failing to press an argument" to the Mine Commission); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755 (D.C. Cir. 2009) (holding the plaintiff forfeited its Appointments Clause challenge "by failing to raise it in its opening brief"); *In re DBC*, 545 F.3d 1373, 1377 (Fed. Cir. 2008) (holding the plaintiffs waived their Appointments Clause challenge to two panel members of the United States Patent and Trademark Office Board of Patent Appeals "by failing to raise it before the Board").

must exhaust issues before the ALJ is not before us." *Id.* at 107. Three Circuit Courts that have addressed whether a claimant must raise an Appointments Clause challenge to SSA ALJs have reached divergent conclusions.[3] In *Cirko on behalf of Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153 (3d Cir. 2020), the Third Circuit held that "exhaustion of Appointments Clause claims is not required in the SSA context." *Id.* Relying on *Lucia* and *Freytag*, in which the Supreme Court excused a plaintiff's failure to raise an Appointments Clause challenge in Tax Court due to "the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers[,]" *Freytag*, 501 U.S. at 879, the Third Circuit determined that "Appointments Clause challenges—given their importance to separation of powers and, ultimately, individual liberty—are claims for which a hearing on the merits is favored." *Cirko*, 948 F.3d at 155.

The *Cirko* court adopted the rationale of the *Sims* Court's plurality to hold that the non-adversarial nature of SSA ALJ hearings "cut[s] against an exhaustion requirement[.]" *Id.* at 156. As the Third Circuit explained,

> while *Sims* does not dictate the answer, its lessons loom large. Like Appeals Council hearings, ALJ hearings have no express exhaustion requirement. *See, e.g., McWilliams v. Berryhill*, No. 18-5180, 2019 WL 2615750, at \*8 (E.D. Pa. June 26, 2019) ("No matter how tortured the reading, the SSA regulations fail to squarely address [exhaustion]."). And like Appeals Council hearings, ALJ hearings are inquisitorial and driven by the agency rather than the claimant: Whereas ALJs must "look[ ] fully into the issues," "[a]ccept[ ] as evidence any documents that are material to the issues," and "decide when the evidence will be presented and when the issues will be discussed," 20 C.F.R. § 404.944, claimants need not even state their case or present written arguments, see id. § 404.949.

*Id.* at 155-56 (alterations in original).

Balancing individual and governmental interests, the Third Circuit found that requiring exhaustion "would impose an unprecedented burden on SSA claimants who are subject, not to an adversarial process, but to an inquisitorial review process." *Id.* at 156. The *Cirko* court further noted that individual interests are "especially acute" in proceedings to determine access to disability benefits because such benefits "are usually

---

[3] Appeals are also pending in the Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits.

claimants' primary source of income—highlighting the need for both the appearance and reality of fair adjudicators appointed impartially under the Appointments Clause and making the 'nature of [a disability] claim' an 'important factor[]' in determining whether to take federal jurisdiction over a procedurally flawed administrative appeal[.]" *Id.* at 157 (alterations in original) (footnote omitted) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 331 n.11 (1976)). The *Cirko* court determined the government's interest in requiring exhaustion is "negligible at best" because constitutional challenges are "'outside the [agency's] competence and expertise[,]'" *id.* at 157-58 (footnote omitted) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010)), and because "[a]t neither the trial nor the appellate levels could the SSA's administrative judges cure the constitutionality of their own appointments, whether by reappointing themselves, or by transferring the case to a constitutionally appointed ALJ[.]" *Cirko on behalf of Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 158 (3d Cir. 2020) (citing *Lucia*, 138 S. Ct. at 2051). It would therefore be "'unrealistic to expect that the [Commissioner] would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context[.]'" *Id.* (quoting *Mathews*, 424 U.S. at 330). Accordingly, the Third Circuit "decline[d] to require exhaustion" of the plaintiff's Appointments Clause challenge before the SSA. *Id.* at 159.

In contrast, the Tenth Circuit held in *Carr v. Comm'r, SSA*, 961 F.3d 1267, 1268 (10th Cir. 2020), that claimants "waive[] their Appointments Clause challenges by failing to exhaust them before the SSA." *Id.*, *cert. docketed*, No. 19-1442 (July 1, 2020). The *Carr* court noted that pursuant to the "general rule . . . an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court." *Id.* at 1271 (quoting *Sims*, 530 U.S. at 112) (O'Connor, J., concurring) (quotation marks omitted). It cited the purpose of issue exhaustion, which is to allow agencies to correct their own mistakes and promote efficiency by expediting claims and limiting the number of cases which reach federal courts. In the context of SSA proceedings, a failure to exhaust an Appointments Clause challenge at the administrative level contravenes these

principles because it "deprive[s] the SSA of its interest in internal error-correction,"

thereby undermining the "[j]udicial efficiency [that] would have been served if the SSA

Commissioner had appointed its ALJs in response to Appellees' raising their

Appointments Clause challenges before the agency." *Id.* at 1273.

The *Carr* court distinguished *Sims* as follows:

> The *Sims* claimant . . . "did everything that the agency asked of her" by
> filling out the form, even though she did not specify the contested issues on
> appeal. [530 U.S.] at 114.

> By contrast, SSA ALJs must notify claimants of the "specific issues to be
> decided" at each hearing, 20 C.F.R. § 404.938(b)(1), and claimants must
> "notify the [ALJs] in writing at the earliest possible opportunity" if they
> "object to the issues to be decided at the hearing," *id.* § 404.939. If
> Appellees' ALJs did not list the Appointments Clause as an issue "to be
> decided," Appellees needed to object and raise it. The claimant in *Sims* did
> not have a similar obligation with respect to Appeals Council review.

*Id.* at 1274-75 (footnote omitted).[4] As a result, the Tenth Circuit found that Justice

O'Connor's controlling opinion in *Sims* "does not apply to SSA ALJ proceedings, where

. . . SSA regulations require claimants to object if they dispute the issues to be decided at

their ALJ hearings." *Id.* at 1275.

The *Carr* court further held that, even if SSA ALJ review is largely non-

adversarial, Appointments Clause challenges themselves are adversarial because the

claimant is challenging the ALJ's authority to decide a case pursuant to 20 C.F.R. §

404.940 and it is the claimant, and not the ALJ, who is "'expected to develop the

issue[].'" *Carr v. Comm'r, SSA*, 961 F.3d 1267, 1275(10th Cir. 2020) (quoting *Sims*, 530

---

[4] The Tenth Circuit observed that Justice O'Connor, who provided the deciding vote in her
concurrence, did not join in the portion of the *Sims* opinion that addressed the non-adversarial
nature of the Appeals Council's proceedings and instead "observed that SSA Appeals Council
petition forms provide only three lines for claimants to specify the bases for appeal[.]" *Carr v.
Comm'r, SSA*, 961 F.3d 1267, 1274 (10th Cir. 2020); *accord Davis v. Saul*, 963 F.3d 790, 793
(8th Cir. 2020) (noting *Sims* "ultimately was decided on narrower grounds" because the
"deciding vote turned on the fact that the agency told the claimant that she could seek review by
sending a letter or filling out a one-page form that should take ten minutes, that only failing to
request Appeals Council review would preclude judicial review, and that the Appeals Council
would review her entire case for issues.") (citation omitted).

U.S. at 110). The Tenth Circuit distinguished *Cirko*, finding the Third Circuit's reasoning "counter to our precedent" which holds that agencies have the power to remedy Appointments Clause challenges. *Id.*; *see also Malouf v. SEC*, 933 F.3d 1248, 1257 (10th Cir. 2019) (explaining administrative Appointments Clause challenge would have notified the agency of the need to appoint its ALJs); *Energy W. Mining Co. v. Lyle ex rel. Lyle*, 929 F.3d 1202, 1206 (10th Cir. 2019) (observing that an Appointments Clause challenge would not have been futile because agency tribunal could vacate judgment of unappointed ALJ).

In *Davis v. Saul*, 963 F.3d 790, 791 (8th Cir. 2020), *cert. docketed*, No. 20-105 (July 31, 2020), the Eighth Circuit agreed with the Tenth Circuit and held that the three claimants at issue waived their Appointments Clause challenges "by failing to raise [them] before the [SSA]." *Id.*; *see also Hilliard v. Saul*, 964 F.3d 759, 763 (8th Cir. 2020) (holding the plaintiff "did not raise to the ALJ an Appointments Clause challenge, so this court need not consider it"). In addition to the arguments considered in *Carr*, the Eighth Circuit held that the exhaustion requirement is "'intensely practical[,]'" and failing to impose an issue exhaustion requirement in SSA proceedings would allow "hundreds if not thousands of social security claimants" to raise "for the first time in federal court a challenge to the manner in which [ALJs] were appointed." *Davis*, 963 F.3d at 794 (quoting *Bowen v. City of N.Y.*, 476 U.S. 467, 484 (1986)).

Like the Eighth and Tenth Circuits, the "vast majority" of district courts have found that claimants must raise an Appointments Clause challenge at some point during an SSA proceeding to preserve it for judicial review. *See Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 351 (S.D.N.Y. 2019) (collecting cases).[5] Some district courts in the

---

[5] *See, e.g.*, *Iris R. v. Saul*, 2020 WL 2475824, at *6 (N.D.N.Y. May 13, 2020) (acknowledging *Cirko* but holding that plaintiff "was still required to raise the Appointments Clause issue at the agency level prior to raising it in federal court"); *Danielle R. v. Comm'r of Soc. Sec.*, 2020 WL 2062138, at *6 (N.D.N.Y. Apr. 29, 2020) (same); *Allen v. Berryhill*, 2019 WL 1438845, at *13 (N.D. Cal. Mar. 31, 2019) (holding the plaintiff forfeited his challenge where he "did not raise an Appointments Clause challenge at the administrative level or at any other time before the March 5, 2019 letter" to the federal court); *Mercer v. Comm'r of Soc. Sec. Admin.*, 2019 WL 1433762, at *3 n.5 (N.D. Ala. Mar. 29, 2019) (finding forfeiture where the plaintiff did not raise his

12

Second Circuit, however, have followed the *Cirko* approach. *See, e.g.*, *Jenny R. v. Comm'r of Soc. Sec.*, 2020 WL 1282482, at *5 (N.D.N.Y. Mar. 12, 2020) ("As I indicated, however, I do find the Third Circuit's opinion in *Cirko* persuasive, and so I am going to follow it in this case and conclude that the [ALJ] in this case was not properly appointed, there was a violation of the Appointments Clause of the Constitution and therefore the result is infected and the matter should be remanded to the Commissioner for further consideration."); *Suarez v. Saul*, 2020 WL 913809, at *4 (D. Conn. Feb. 26, 2020) ("I respectfully disagree with the[] contrary decisions [of other district courts] for the reasons well-stated by the Third Circuit in *Cirko* and also by other recent district court rulings.") (collecting cases).

In this case, the court agrees with the Eighth and Tenth Circuits and holds that Plaintiff was required to raise her Appointments Clause challenge while her case was still pending before the SSA to preserve it for judicial review. 20 C.F.R. § 404.940 places an affirmative obligation on claimants to "notify the [ALJ] at [the] earliest opportunity" if they "object to the [ALJ] who will conduct the hearing[.]" *Id.* It is irrational for a claimant to rely on the non-adversarial nature of SSA proceedings as grounds for not

___

challenge "at any point during his administrative proceedings"); *Perez v. Berryhill*, 2019 WL 1405642, at *4 (S.D. Fla. Mar. 28, 2019), *appeal docketed*, 19-11660 (Apr. 29, 2019) (defining a "timely" challenge "with regard to the Appointments Clause[] [a]s one that is made during the course of the administrative proceedings where the alleged constitutional violation is taking place"); *Diane S. P. v. Berryhill*, 379 F. Supp. 3d 498, 523 (E.D. Va. 2019), *appeal docketed*, 19-1681 (June 25, 2019) ("Unlike in *Sims*, where the claimant at least notified the SSA she disagreed with the substance of the ALJ's disability finding in the context of a regulatory scheme requiring little more, plaintiff and her attorneys gave no notice of any challenge to the ALJ's appointment."); *Flack v. Comm'r of Soc. Sec.*, 2019 WL 1236097, at *3 (S.D. Ohio Mar. 18, 2019) (holding forfeiture occurred when "Plaintiff failed to raise an Appointments Clause challenge before the ALJ or the Appeals Council"); *Stewart v. Berryhill*, 2019 WL 772334, at *8 (E.D.N.C. Feb. 20, 2019) (finding forfeiture where "there is no evidence in the record that Claimant challenged the ALJ's appointment in the administrative proceeding before the SSA"); *Catherine V. v. Berryhill*, 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019) ("Here, however, Plaintiff did not raise her Appointments Clause challenge in the administrative proceedings and, therefore, did not preserve it for judicial review."); *Abbington v. Berryhill*, 2018 WL 6571208, at *3 (S.D. Ala. Dec. 13, 2018) (holding plaintiff forfeited Appointments Clause challenge where she "concedes that her Appointment Clause challenge was not raised at any point during her administrative proceedings").

challenging the adjudicator's authority to preside. It is equally irrational to expect the adjudicator to challenge his or her own authority. Allowing an Appointments Clause challenge after the case reaches federal court disincentivizes claimants and their lawyers from raising a challenge when any deficiency may be promptly redressed. A claimant could thus await the outcome at the administrative level and, if unfavorable, save his or her Appointments Clause challenge for federal court.

The Commissioner's power to rectify unconstitutional appointments is evident from its issuance of the emergency message appointing all ALJs several weeks after *Lucia* was decided and its promulgation of SSR 19-1p, which grants a new hearing to all claimants who raised an Appointments Clause challenge while review of their claims was still pending before the Appeals Council. In failing to raise her Appointments Clause challenge before the ALJ or the Appeals Council,[6] Plaintiff divested the SSA of "an opportunity to correct its own mistakes with respect to the programs it administers before it [was] haled into federal court[.]" *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)) (quotation marks omitted) (describing the "first" purpose of exhaustion of administrative remedies); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.").

---

[6] The Appeals Council denied review of Plaintiff's claims on April 25, 2018, several months before *Lucia* was decided on June 21, 2018. Nonetheless, Plaintiff, who was represented by counsel in her SSA proceedings, was arguably on notice of the existence of a potential Appointments Clause challenge before the Supreme Court issued its opinion. In 2016, the Tenth Circuit decided *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016), wherein it held that SEC ALJs were inferior officers whose appointments are subject to the Appointments Clause, and the District of Columbia Circuit Court created a circuit split in June of 2017 when it rejected the plaintiff's Appointments Clause challenge by summarily denying review of the SEC's decision. Plaintiff thus "had access to the building blocks of an Appointment[s] Clause challenge long before [*Lucia*] existed" and could have raised that challenge at her hearing or to the Appeals Council before it denied review. *Honeycutt v. Saul*, 2020 WL 1430475, at *4 (W.D. Ky. Mar. 23, 2020) (citation and quotation marks omitted)

14

Even if the court excused exhaustion before the Appeals Council and the ALJ, it could not find a timely presentation of an Appointments Clause challenge here. To obtain a new hearing before a new ALJ, Plaintiff was required not only to "contest[] the validity of [ALJ Malvey's] appointment before the [SSA]," but to "continue[] pressing that claim" in federal court. *Lucia*, 138 S. Ct. at 2055. *Lucia* was decided on June 21, 2018. The Commissioner issued its emergency message ratifying the appointment of SSA ALJs on July 16, 2018. Notwithstanding this notice, Plaintiff did not seek to amend her Complaint to challenge ALJ Malvey's constitutional authority to make a disability determination, nor did she raise an Appointments Clause challenge as one of her seven challenges to the ALJ's decision in her motion for reversal. She instead filed a separate motion to remand in May of 2019, approximately eleven months after the Supreme Court decided *Lucia*. By failing to timely raise her Appointments Clause challenge to the ALJ and asserting that claim in federal court for the first time after her appeal was fully briefed, Plaintiff did not make a timely challenge.

Plaintiff's case is not one of the "rare" cases in which the court should exercise its discretion to excuse Plaintiff's forfeiture. *Freytag*, 501 U.S. at 879. Although Plaintiff argues that the court need not reach the merits of her Appointments Clause challenge and should instead only remand to the Appeals Council for consideration of her August 1, 2018 letter, the court's authority to remand is limited by 42 U.S.C. § 405(g). Sentence four authorizes the court to remand "in conjunction with a judgment affirming, modifying, or reversing the [Commissioner's] decision[,]" and sentence six allows the court to remand either "in light of additional evidence without making any substantive ruling as to the correctness of the [Commissioner's] decision, but only if the claimant shows good cause for failing to present the evidence earlier[,]" or on a motion made by the Commissioner before it files a response. *Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991) (footnote omitted). These are "the *only* kinds of remands permitted under the statute[.]" *Id.* at 99 (emphasis in original). Neither authorizes the court to remand because the Appeals Council has not yet addressed a request for reconsideration. *See Califano v. Sanders*, 430 U.S. 99, 107-08 (1977) (holding the Social Security Act "cannot be read to

15

authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits").

For the foregoing reasons, the court DENIES Plaintiff's motion to remand to the Appeals Council to rule on her August 1, 2018 request for reconsideration in light of her Appointments Clause challenge and holds that Plaintiff did not timely raise an Appointments Clause challenge in this action.

## IV.   Whether to Reverse or to Affirm the Decision of the Commissioner.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts and determines credibility issues, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

A.    **Whether the ALJ Properly Evaluated Plaintiff's Physical Impairments at Step Two.**

    1.    **Whether the ALJ Erred in Determining Plaintiff's Carpal Tunnel Syndrome, Trigger Fingers, or Osteoarthritis Were Not Severe Impairments.**

Plaintiff contends that the ALJ erred in finding that her carpal tunnel syndrome, trigger fingers, and osteoarthritis were not severe impairments. The Second Circuit has repeatedly held that "the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151; *see also Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (agreeing with the Supreme Court and sister circuits that "Step Two may do no more than screen out *de minimis* claims") (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring)).

An impairment or combination of impairments is "severe" at Step Two if it "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). In contrast, an impairment is "not severe" if the medical evidence clearly establishes it has no more "than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities[.]" SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985); *see also James C. v. Comm'r of Soc. Sec.*, 2020 WL 103813, at *4 (D. Vt. Jan. 9, 2020) ("An impairment is 'not severe' when medical evidence establishes 'only a slight abnormality . . .[,] which would have no more than a minimal effect on [the claimant's] ability to work.'") (alterations in original) (quoting SSR 85-28, 1985 WL 56856, at *3). Whether an impairment is "severe" also has a durational component: "Unless [a claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least [twelve] months." 20 C.F.R. § 404.1509.

At Step Two, ALJ Malvey determined Plaintiff's bilateral carpal tunnel syndrome, trigger fingers, and osteoarthritis were not severe impairments because, among other things, a right-sided carpal tunnel release in November of 2014 resulted in significant relief of her symptoms. Thereafter, Plaintiff did not follow up with her orthopedic

surgeon until August of 2015, at which time the surgeon found that Plaintiff's incision was well healed, that she had good capillary refill in all of her digits, that she had no localized tenderness, that she had no swelling or other inflammatory changes, and that she could make a fist easily. Plaintiff was nonetheless referred to physical therapy due to complaints of right hand weakness. The ALJ found Plaintiff's physical therapist's treatment notes from approximately September of 2015 indicated Plaintiff was fully independent in all activities of daily living and working full-time as a baker. Plaintiff does not contest the accuracy of that finding.

With regard to Plaintiff's trigger fingers, ALJ Malvey acknowledged Plaintiff received some treatment for her right trigger finger during the period of alleged disability; however, he relied on the consultative examination of Alan Lilly, M.D. dated May 25, 2016, authored approximately four months after Plaintiff's alleged onset date, wherein Dr. Lilly examined Plaintiff and opined her right hand "at this time . . . is completely normal." (AR 541.) Plaintiff herself reported that she felt her right hand had "return[ed] to feeling normal" following surgery and that she had "done very well" after steroid injections in her trigger fingers. *Id.* at 540. Dr. Lilly reported that Plaintiff had a normal range of motion in the right hand and in all fingers and could easily make a fist, extend her fingers, and "oppose the thumb." *Id.* at 541. Plaintiff's left hand had some mild tenderness where she had a nodule related to her trigger finger but otherwise moved very well, had good sensation, and had excellent motor strength. Despite some mild tenderness in Plaintiff's left elbow, she was able to move her arm "very well" and had good pulses and sensation. *Id.*

Although Plaintiff is correct that the ALJ did not note Dr. Lilly's observation that Plaintiff was "developing [a] moderately severe carpal tunnel problem involving both wrists and to a lesser extent, trigger fingers[,]" Dr. Lilly also opined that Plaintiff "ha[d] made an excellent recovery following the carpal canal decompression"; "ha[d] done well with treatment"; "did not complain of any pain in her hands during [the] evaluation"; and had "no evidence of recurrent or producible fatigue in her hands[.]" *Id.* He noted she had intact sensation in both hands and had an "excellent ability to perform fine and gross

18

motor tasks." *Id.*

Plaintiff argues that Dr. Lilly examined her only once and did not review her medical records. She does not dispute, however, the accuracy of his findings. Plaintiff's medical records following Dr. Lilly's examination support the ALJ's conclusion that Plaintiff's physical impairments continued to have no more than a minimal effect on Plaintiff's ability to work throughout the period of alleged disability. In June of 2016, Plaintiff reported to Lori Gurney, M.S. that she enjoys four-wheeling. On December 5, 2016, x-rays revealed Plaintiff had only "[m]ild degenerative changes" in her right hand and left shoulder. (AR 588-89.) Electrodiagnostic testing of Plaintiff's right wrist conducted on February 2, 2017 was "mildly abnormal[,]" for which Erica Sweet, D.O. recommended only that Plaintiff "return to wearing cockup wrist brace at night." *Id.* at 571-72. Dr. Sweet examined Plaintiff and found she had normal muscle bulk and tone in her arms, normal sensation, and 5/5 strength throughout.

On February 2, 2017, Plaintiff's treating physician, Maurice Geurts, M.D., noted Plaintiff had right and left hand pain but thought it "[s]eem[ed] to be more like an overuse injury" because her diagnostic testing was "not too revealing, just mild arthritis." *Id.* at 708. He observed Plaintiff's pain is worse at the end of the day without morning stiffness, which "is all more indeed consistent with wear and tear or osteoarthritis/mechanical than inflammatory arthritis." *Id.* He further found that Plaintiff had normal motor function, no focal deficits, and that her cranial nerves were grossly intact. On February 24, 2017, Plaintiff reported to OT Stone that she had been working twenty hours per week at the Harmonyville Store making sandwiches. *See id.* at 850. OT Stone recommended that Plaintiff perform wrist and digit stretches and nerve glides until Plaintiff saw an orthopedist. *Id.* at 851. On March 29, 2017, Plaintiff reported to Physical Therapist Margaret Vandenbergh that her left shoulder pain "feels a little better." (AR 857.)

ALJ Malvey also cited treatment records obtained from orthopedist Ann Stein, M.D. from the Rutland Vermont Orthopaedic Clinic, who evaluated Plaintiff on March 7, 2017 and noted Plaintiff reported only some achy discomfort in the joints and stiffness

and denied any numbness or tingling. Plaintiff further reported that her right hand carpal tunnel surgery was effective, she "does not have a positive rheumatoid factor[,]" and "[s]he used to have triggering in her fingers, but these have been injected and the triggering has resolved." *Id.* at 569. Dr. Stein reviewed Plaintiff's February 2, 2017 electrodiagnostic testing and determined it "actually shows very mild changes as is often seen after successful carpal tunnel release." *Id.* Upon examination, Dr. Stein found Plaintiff had a well-healed carpal tunnel scar on her right hand, no triggering of any digits, no enlargement of the CMC joint, and only "some restriction of range of motion of the wrists with volar flexion to approximately 70 degrees bilaterally, and dorsiflexion to about 70 degrees bilaterally." *Id.* at 570. Plaintiff could form a full fist and fully extend her fingers. Dr. Stein diagnosed Plaintiff with "[r]esolved carpal tunnel status post surgery" and referred Plaintiff to a rheumatologist to address her reported symptoms of hand pain and stiffness. *Id.* Dr. Stein's opinion is the last examination of Plaintiff by an orthopedic specialist.

ALJ Malvey also examined Plaintiff's activities of daily living and determined her "overall level of activity to be inconsistent with the allege[d] severity of her symptoms and limitations[,]" *id.* at 16, observing that:

> During the period since her alleged onset date, she further acknowledges an ongoing ability to: prepare simple meals; do some household chores (laundry, dishes, and bringing in wood); drive; use a computer to shop; use a checkbook; and do some yard work. A review of the claimant's medical records also further reveals evidence of the claimant's report of: doing some odd jobs such as lawn trimming; volunteering at a thrift shop; and four-wheeling. The claimant is also noted to report performing some part-time work as a kitchen worker and cook, prior to beginning her more recently acquired, full-time position (as of approximately March 2017), as a machine operator/ paper towel packager at a local paper factory.

(AR 16) (citations omitted). Although Plaintiff challenges the ALJ's consideration of her full-time work at Soundview Paper starting in March of 2017, she does not dispute that she worked full-time as a cook/baker at Dutton Farm Stand until January 2016 and only discontinued working there due to a dispute with her employer. *See id.* at 54 (stating in her hearing testimony that she stopped working at Dutton's because she "had a falling out

with the owner"). She further acknowledges that, at times throughout 2016 and 2017, she worked part-time performing light kitchen work and making sandwiches.

ALJ Malvey's finding that Plaintiff's bilateral carpal tunnel syndrome, trigger fingers, and osteoarthritis were not significantly limiting is supported by substantial evidence because he accurately characterized the vast majority of her medical records and drew rational inferences from the competing evidence. While the record includes evidence that Plaintiff suffered pain in her hands and left elbow and contains Dr. Lilly's arguably inconsistent findings, the court cannot say that "a reasonable factfinder would have to conclude" that these impairments had more than a minimal effect on Plaintiff's ability to work. *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010) (holding substantial evidence supported ALJ determination that plaintiff did not have severe COPD at Step Two where "her medical records fail to indicate any shortness of breath" and she reported to medical providers that "her symptoms were improving") (summary order). In any event, because the ALJ considered all of Plaintiff's impairments in formulating her RFC, any error in failing to characterize certain impairments as "severe" was harmless.

### 2. Whether the ALJ Erred in Evaluating the Opinions of State Agency Consultants Geoffrey Knisely, M.D. and Elizabeth White, M.D. at Step Two.

Plaintiff argues that ALJ Malvey erred in giving "strong weight" (AR 16) to the opinions of state agency consultants Geoffrey Knisely, M.D. and Elizabeth White, M.D., who both opined Plaintiff did not have a severe medically determinable impairment because they did not review all of Plaintiff's medical records and because their evaluations occurred in the summer of 2016, which does not cover the full period of alleged disability.

When making a determination of disability, an ALJ must consider "all of the available evidence in the individual's case record[,]" including the opinions of medical sources. SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006).[7] The ALJ will consider

---

[7] SSR 06-03p was rescinded effective March 27, 2017. *See* Rescission of Soc. Sec. Rulings 96-

the following factors for "every medical opinion [he or she] receive[s]": (1) whether the source examined the claimant; (2) whether the source is a treating source, and, if so, the length of the treatment relationship and frequency of examination, and the nature and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence, "particularly medical signs and laboratory findings"; (4) the consistency of the opinion "with the record as a whole"; (5) whether the opinion is authored by "a specialist" and is "about medical issues related to his or her area of specialty"; and (6) other factors "which tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c); *accord* SSR 06-03p, 2006 WL 2329939, at \*4-5.

"State agency physicians are qualified as experts in the evaluation of medical issues in disability claims[,]" and their opinions may therefore "constitute substantial evidence if they are consistent with the record as a whole." *Darling v. Astrue*, 2012 WL 642459, at \*5 (D. Vt. Feb. 6, 2012) (quoting *Babcock v. Barnhart*, 412 F. Supp. 2d 274, 280 (W.D.N.Y. 2006)). A state agency consultant's opinion does not become "stale" due to the existence of subsequent medical records as long as "the additional evidence does not raise doubts as to the reliability" of the opinion and the new evidence does "not differ materially" from the previously considered evidence. *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (internal quotation marks omitted) (summary order); *see also Lesanti v. Comm'r of Soc. Sec.*, 436 F. Supp. 3d 639, 646 (W.D.N.Y. 2020) ("A more dated opinion may constitute substantial evidence if it is consistent with the record as a whole notwithstanding its age.").

On June 15, 2016, Dr. Knisely opined that Plaintiff has a history of carpal tunnel syndrome and trigger fingers but that Plaintiff's medical records revealed no associated functional limitations. He further found that Plaintiff's elbow pain did not constitute a

---

2p, 96-5p, and 06-03p, Fed. Reg. 82, 15,263 (Mar. 27, 2017). Because Plaintiff filed her DIB application prior to March 27, 2017, SSR 06-03p applies to her claim. *See id.* ("This rescission will be effective for claims filed on or after March 27, 2017."); *Harrison v. Comm'r of Soc. Sec.*, 2018 WL 3153399, at \*3 n.4 (W.D.N.Y. June 28, 2018) ("SSR 06-03p has been rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, but remains in effect for claims filed before March 27, 2017.").

22

medically determinable impairment because two x-rays dated April 29, 2014[8] and December 24, 2015,[9] respectively, yielded generally unremarkable results. He also reviewed in detail Dr. Lilly's May 25, 2016 examination notes and noted Dr. Lilly's conclusions that Plaintiff made an excellent recovery from her carpal tunnel surgery and that her left hand moved well with good sensation and excellent motor strength. Based on this evidence, he determined that Plaintiff did not have a severe physical impairment.

On July 5, 2016, Dr. White reevaluated Plaintiff's medical records upon reconsideration of the SSA's initial determination that Plaintiff was not disabled. Dr. White also noted Plaintiff's history of carpal tunnel syndrome and trigger fingers but opined that her medical records revealed "no issues with function." (AR 89.) She concluded that Plaintiff's left elbow pain was "mild" and did not constitute a medically determinable impairment. *Id.* ALJ Malvey afforded "[s]trong weight" to both Dr. Knisely's and Dr. White's opinions at Step Two because they were "consistent with medically documented objective findings noted throughout the claimant's treatment records . . . including findings noted by [Dr.] Lilly," as well as evidence regarding her "overall level of activity during the period under review[.]" *Id.* at 16-17.

Consideration of Plaintiff's records post dating Dr. Knisely's and Dr. White's opinions would not have changed the outcome of their assessments because those records reflect only mild pain in Plaintiff's hands and left elbow that was being treated with stretches and the use of a brace. Although Plaintiff argues that Dr. Knisely and Dr. White did not review "new EMG studies confirming the presence of [] carpal tunnel syndrome[,]" (Doc. 21 at 4), diagnoses "standing alone" are "insufficient to show disabling severity." *Shaffer v. Comm'r of Soc. Sec.*, 2019 WL 2521180, at *2 (W.D.N.Y.

---

[8] Plaintiff's April 29, 2014 x-ray of her left elbow, taken at Grace Cottage Hospital, revealed: "No joint effusion. No acute fracture or dislocation. No significant degenerative spurs. No soft tissue calcification. . . . No significant arthritic changes." (AR 516) (emphasis omitted).

[9] Plaintiff's December 24, 2015 x-ray of her right hand, taken at Brattleboro Memorial Hospital, showed "some faint calcification" at "the base of the fourth digit proximal phalanx[.]" (AR 286.) The individual interpreting the x-ray stated it "is possible this is a tiny chip or avulsion fracture." *Id.*

June 19, 2019); *see also Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (holding a "mere diagnosis . . . without a finding as to the severity of symptoms and limitations does not mandate a finding of disability") (summary order). Dr. Stein reviewed the last EMG in Plaintiff's medical record and characterized it as documenting only "very mild changes[.]" (AR 569.) Her observation that Plaintiff had "reportedly . . . diffuse osteoarthritis" reflected Plaintiff's self-report and recollection of x-rays taken at Grace Cottage Hospital[10] which Plaintiff did not bring to her evaluation. *Id.* Dr. Stein further recorded that Plaintiff had "[r]esolved carpal tunnel status post surgery" and that steroid injections had fully resolved the pain in her trigger fingers. *Id.* at 570. During this same time period, Plaintiff's treating physician found that Plaintiff's hands had normal motor function, she had no focal deficits, and she was neurologically intact, and the interventions recommended and prescribed were relatively minor.

The ALJ also properly considered Plaintiff's work and activities of daily living. Contrary to Plaintiff's assertions, working consistently part- and full-time does not constitute "sporadic physical activities[.]" *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (observing there is a "difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). Plaintiff's medical records and reported activities of daily living following Dr. Knisely's and Dr. White's assessments, including her continued part- and full-time work in food services and as a hand packager, are consistent with their conclusions that Plaintiff had no functional limitations related to her carpal tunnel syndrome, trigger fingers, and osteoarthritis.

Because Plaintiff's medical records following Dr. Knisely's and Dr. White's assessments "do not differ materially" from those they reviewed and do not raise any doubts as to the reliability of their opinions, the ALJ did not commit reversible error in the weight he accorded their opinions. *See Camille*, 652 F. App'x at 28 n.4 (affirming

---

[10] It is not clear if these are the same x-rays that Dr. Knisely reviewed in rendering his RFC assessment or the December of 2016 x-rays revealing mild degenerative changes in Plaintiff's right hand and left shoulder, which Dr. Knisely did not review.

ALJ's reliance on state agency consultant opinion despite a subsequent treating physician opinion because the more recent opinion did "not differ materially" from the treating physician's previous opinion, "which [the consultant] did review"); *McNaughton v. Saul*, 2020 WL 1514727, at *10 (W.D.N.Y. Mar. 30, 2020) (holding ALJ did not err in relying on "stale" state agency opinions where medical evidence indicated "there was no significant change in [p]laintiff's physical condition or mental condition after" the state agency consultants' assessments and "various treating doctors consistently reported negative/benign findings that were consistent with" the consultants' opinions); *Lesanti*, 436 F. Supp. 3d at 646 (holding two-year-old medical opinion was not "stale" where subsequent treatment records did not show plaintiff's "condition significantly deteriorated" thereafter).

### 3.   Whether the ALJ Properly Interpreted the "Duration" Requirement at Step Two.

Plaintiff argues that ALJ Malvey misinterpreted the "duration" requirement under SSR 82-52, the purpose of which is to "state and explain the policy regarding the duration requirement under the disability provisions of . . . the Social Security Act and implementing regulations." 1982 WL 31376, at *1 (Jan. 1, 1982). 20 C.F.R. § 404.1520(a)(4)(ii) provides that an ALJ will not find a claimant disabled if he or she does "not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement[.]" *Id.* 20 C.F.R. § 404.1509 states that: "Unless [a claimant's] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least [twelve] months." *Id.*

A denial of disability due to insufficient duration is "applicable in all cases in which": (1) "[t]he impairment(s) was or is of such severity that the claimant was or is unable to engage in any [substantial gainful activity] (or any gainful activity); *but*" (2) "[b]y the end of [twelve] months, the impairment is, or will be, no longer of such severity as to prevent [substantial gainful activity]." SSR 82-52, 1982 WL 31376, at *3 (emphasis supplied). When an ALJ denies DIB on the basis of insufficient duration, the ALJ must

"state clearly" in his decision that either:

> Within [twelve] months of onset, there was or is expected to be sufficient restoration of function so that there is or will be no significant limitation of the ability to perform basic work-related functions.

> Within [twelve months] of onset, there was or is expected to be sufficient restoration of function so that in spite of significant remaining limitations the individual should be able to do past relevant work or otherwise engage in [substantial gainful activity], considering pertinent vocational factors.

> In the latter case, a thorough documentation, evaluation, and rationalization of the claimant's RFC, work history, and vocational potential will be necessary.

*Id.* (citations omitted).

In this case, ALJ Malvey determined that Plaintiff's upper extremity impairments, "including: bilateral carpal tunnel syndrome, trigger finger(s), some recurrent left elbow epicondylitis, and degenerative changes in her hands and left shoulder," were not severe impairments because:

> I find that the record fails to reveal evidence of any medically determinable physical impairment that has resulted in any significant limitation in her ability to perform basic work activities for any consecutive [twelve]-month period so as to meet the criteria for a 'severe' impairment as defined by the Act (20 CFR 404.1520(c)). A review of the claimant's records fails to reveal evidence of medically documented objective findings and/or a treatment history consistent with the alleged severity of her symptoms and limitations, while evidence of record with regard to her ongoing level of activity is also found to be inconsistent with her alleged degree of functional limitation.

(AR 14).

The ALJ found Plaintiff's physical impairments did not meet the Step Two requirements due to their lack of severity. "An impairment's severity, however, is not the same as, nor is it dependent upon, its duration." *Stadler v. Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) (emphasis omitted). SSR 82-52 requires the ALJ to make certain affirmative findings regarding duration for "[a]ll cases denied on the basis of insufficient duration[.]" 1982 WL 31376, at *3.

The ALJ's mention of the durational requirement was harmless because it was not

26

the only reason for denying Plaintiff's DIB application. The ALJ cited other reasons for
not finding certain impairments severe, including a thorough review of the medical
record, Plaintiff's activities of daily living, and her performance of kitchen duties from
October 2016 through the date of the hearing as well as full-time work as a hand
packager starting in March of 2017.

## B.    Whether the ALJ Failed to Accord Sufficient Weight to the Opinions of Alexandra Scarlett, M.A.

Plaintiff argues the ALJ did not give appropriate weight to the May 11, 2017
Medical Source Statement of Alexandra Scarlett, M.A., Plaintiff's treating therapist,
because the ALJ cherry-picked from Plaintiff's medical records to support his opinion
while overlooking evidence indicating Plaintiff's mental impairments were severe.

SSA regulations define "medical opinions" as "statements from acceptable
medical sources that reflect judgments about the nature and severity" of the claimant's
impairments, including "symptoms, diagnosis and prognosis," what the claimant "can
still do despite impairment(s)," and the claimant's "physical or mental restrictions." 20
C.F.R. § 404.1527(a)(1). Although Ms. Scarlett was Plaintiff's treating therapist, Plaintiff
concedes that at the time she applied for DIB, Ms. Scarlett was an "other source[]" rather
than an "acceptable medical source[][.]" SSR 06-03p, 2006 WL 2329939, at *2. As a
result, the ALJ had "discretion to determine the appropriate weight to accord [her]
opinion based on all the evidence before him[.]" *Diaz v. Shalala*, 59 F.3d 307, 314 (2d
Cir. 1995).

While "other source" opinions are not entitled the same controlling weight as
treating source opinions, they are evaluated using the same factors as other non-treating
source medical opinions because they "may reflect the source's judgment about some of
the same issues addressed in medical opinions from acceptable medical sources." 20
C.F.R. § 404.1527(f)(1). Those factors include: (1) "[h]ow long the source has known
and how frequently the source has seen the individual;" (2) "[h]ow consistent the opinion
is with other evidence;" (3) "[t]he degree to which the source presents relevant evidence
to support an opinion;" (4) "[h]ow well the source explains the opinion;" (5) "[w]hether

27

the source has a specialty or area of expertise related to the individual's impairment(s);" and (6) "[a]ny other factors that tend to support or refute the opinion." SSR 06-03p, 2006 WL 2329939, at *4-5; *see also* 20 C.F.R. § 404.1527(c). "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,'" particularly if "he or she has seen the individual more often" and "has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-03p, 2006 WL 2329939, at *5; *accord* 20 C.F.R. § 404.1527(f)(1).

On June 8, 2016, Angela Wells of Vermont's Disability Determination Services ("DDS") received a voicemail from Ms. Scarlett, in which Ms. Scarlett informed DDS that she would not submit her treatment records because she had met with Plaintiff that day and did "not feel she is disabled." (AR 551.) Ms. Scarlett opined that Plaintiff is "challenged emotionally and has some decompensation at her age but works very hard and does a good job working on her emotions." *Id.* Ms. Scarlett further advised that "working is good for [Plaintiff] to be engaged with others and social" and ultimately stated "she [cannot] provide any information supporting [Plaintiff's] claim of disability." *Id.*

On May 11, 2017 Ms. Scarlett submitted a Medical Source Statement opining Plaintiff had predominantly mild or fair limitations in her ability to understand, remember, or apply information; interact with others; concentrate, persist, and maintain pace; and adapt or manage herself, and "impaired" functioning in her ability to handle conflicts with others; initiate or sustain conversation; respond to requests, suggestions, criticism, correction, and challenges; respond to demands; and adapt to changes. *Id.* at 567-68. She found Plaintiff had "marked" impairments in two areas of functioning: her ability to complete tasks in a timely manner and "manag[e] [her] psychologically-based symptoms[.]" *Id.* at 568. In the narrative field, Ms. Scarlett explained that Plaintiff has PTSD and noted she reviewed the questions on the statement with Plaintiff and "agreed on these ratings based on previous knowledge of [Plaintiff's] work history and discussing

28

specific situations" that day. *Id.*

At both Step Three and Step Four, ALJ Malvey gave Ms. Scarlett's opinions only "some weight" (AR 19) because he found Ms. Scarlett's determination that Plaintiff had marked limitations in her ability to manage her psychologically based symptoms and complete tasks in a timely manner were "inconsistent with her own opinion, previously offered as of June 2016, that working would be good for [Plaintiff] as well as evidence of [Plaintiff's] actual work activity." *Id.* (citation omitted). In contrast, the ALJ gave "strong weight" to the June 2016 and July 2016 opinions of state agency consultants Howard Goldberg, Ph.D. and Thomas Reilly, Ph.D., respectively, who reviewed Plaintiff's medical records and opined Plaintiff had the capacity to understand, remember, and carry out one-to-three-step instructions in a low production norm setting and to sustain concentration, persistence, and pace for two-hour periods over the course of a typical eight-hour workday and forty-hour workweek. *Id.* at 19, 79, 92. They further opined Plaintiff could not maintain intense or frequent social interactions with supervisors, co-workers, or the general public, but retained the capacity for ordinary social interactions and occasional and simple task changes. *See id.* at 80, 93-94.

The ALJ's weighing of Ms. Scarlett's, Dr. Goldberg's, and Dr. Reilly's opinions is supported by substantial evidence and cannot be disturbed even if this court might reach different conclusions. Ms. Scarlett advised DDS in June of 2016 that Plaintiff was not disabled and less than one year later opined that Plaintiff had marked limitations in her ability to be timely and "manag[e] [her] psychologically-based symptoms[.]" *Id.* at 568. The latter opinion conflicts with Dr. Geurts's treatment notes indicating that Plaintiff was "doing well" and reported she had "not felt this good in many years[,]" *id.* at 334, and that her depression was "controlled." (AR 321.) It also conflicts with Plaintiff's reports to Physician Assistant Natalie Harding in February of 2017 that she felt her "emotional/mental health issues" are "now well controlled[.]" *Id.* at 702. Ms. Scarlett's opinion is further at odds with Plaintiff's self-reported part- and full-time work as well as her other activities of daily living. *See Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014) (holding substantial evidence supported giving treating physician only probative

weight where assessment "was inconsistent with his own treatment notes, with the
conclusions of other medical experts, and with [the plaintiff's] testimony regarding her
daily functioning") (summary order); *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir.
2011) (finding treating physician opinion was not entitled to controlling weight where it
was "called into question by other medical evidence in the record, including his own
earlier reports[,]" "other medical opinions[,]" and the plaintiff's "description of his daily
activities") (summary order).

To the extent Plaintiff contends that the ALJ "completely ignored . . . Plaintiff's
testimony as to the jobs she has quit, been physically unable to do, [and] the many
conflicts she has had because of her mental health condition" in evaluating Ms. Scarlett's
opinion (Doc. 12 at 15), Ms. Scarlett offered no opinion regarding Plaintiff's physical
impairments, and her opinion regarding Plaintiff's mental impairments has been
addressed. Plaintiff's own testimony regarding her mental health—that she does not "do
well around a lot of people" and "tend[s] to go off very easily, fly off the handle" (AR 51,
57)—is consistent with the portions of Ms. Scarlett's Medical Source Statement that the
ALJ credited and the non-exertional limitation in her RFC to "occasional interaction with
supervisors, co-workers[,] and the general public[.]" *Id.* at 20. The ALJ therefore did not
err in according Ms. Scarlett's May 11, 2017 Medical Source Statement only some
weight at Steps Three and Four.

## C. Whether the ALJ Improperly Relied on Erroneous Vocational Expert Testimony.

Plaintiff contends that ALJ Malvey erred in relying on the VE's testimony in
finding Plaintiff could perform her past work as generally performed because the VE
testified that the work of a sandwich maker can be performed at the light exertional level,
whereas the Dictionary of Occupational Titles ("DOT") classifies the job of "sandwich
maker" as involving medium exertional level work. According to Plaintiff, the ALJ did
not provide a reasonable explanation for departing from the DOT as required by SSR 00-
4p.

Pursuant to SSR 00-4p, "[o]ccupational evidence provided by a VE . . . generally

30

should be consistent with the occupational information supplied by the DOT." 2000 WL 1898704, at *2 (Dec. 4, 2000). When there is an "apparent unresolved conflict" between the VE's testimony and the DOT, an ALJ "must elicit a reasonable explanation for the conflict before relying on the VE . . . to support a determination or decision about whether the claimant is disabled." *Id.* The SSA has construed this mandate as "part of the adjudicator's duty to fully develop the record," and thus an ALJ "will inquire, on the record, as to whether or not there is such consistency." *Id.*

SSR 00-4p and the DOT apply at both "[S]teps [Four] and [Five] of the sequential evaluation process." *Id.* At Step Four, "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis omitted). Because experts are "often called upon to explain the requirements of particular jobs," deviations between the VE's testimony and the DOT with respect to the claimant's previous specific job "do not actually 'conflict' with the Dictionary." *Id.* With regards to exertional level of jobs as they are generally performed, however, the "regulatory definitions . . . are controlling" even if "there may be a reason for classifying the exertional demands of an occupation (as generally performed) differently than the DOT (e.g., based on other reliable occupational information)[.]" SSR 00-4p, 2000 WL 1898704, at *3. "For example, if all available evidence (including VE testimony) establishes that the exertional demands of an occupation meet the regulatory definition of 'medium' work, the adjudicator may not rely on VE testimony that the occupation is 'light' work." *Id.* (citations omitted).

At Plaintiff's hearing, ALJ Malvey asked VE Maxim to describe Plaintiff's past work as actually performed and as generally performed in the national economy. In describing the position of "sandwich maker," VE Maxim noted the DOT defines sandwich maker as involving medium exertional work with a specific vocational preparation level of two. *See* AR 64. VE Maxim testified his "observation is in today's marketplaces are merely performed at the light level[.]" *Id.* The ALJ then asked VE Maxim two hypotheticals, one of which involved medium exertional work and the other

31

of which involved light exertional work. Both hypotheticals included limitations to frequent reaching and handling; simple, routine, and repetitive tasks in a non-production-rate environment; occasional interaction with supervisors, co-workers, and the general public; and simple work-related decisions. VE Maxim opined that the medium exertional hypothetical would allow Plaintiff to perform her past work as a prep cook and a sandwich maker, whereas the light exertional hypothetical would allow Plaintiff to perform "the sandwich making as I believe it is currently performed in the marketplace." *Id.* at 65.

At Step Four, ALJ Malvey determined Plaintiff "is capable of performing her past relevant work as a prep cook and/or sandwich maker as these occupations are generally performed." *Id.* at 24. The ALJ relied on VE Maxim's testimony that "an individual with the same vocational profile as [Plaintiff] and a [RFC] such as that of [Plaintiff] . . ., including additionally, however, an assessed capacity for a range of medium exertion work, could perform [Plaintiff's] past relevant work as a prep cook or sandwich maker as these occupations are generally performed" even though the ALJ found that Plaintiff has no exertional or manipulative limitations. *Id.*

Any failure to clarify the alleged conflict between the VE's testimony and the DOT regarding the exertional level of a sandwich maker was harmless because the VE testified that Plaintiff could perform her past relevant work as a prep cook, which is defined by the DOT as involving medium exertional work. *See Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (holding failure to comply with SSR 00-4p "was harmless because the ALJ was entitled to rely on other, unchallenged VE testimony"); *Polynice v. Colvin*, 2013 WL 6086650, at *17 n.30 (N.D.N.Y. Nov. 19, 2013), *aff'd*, 576 F. App'x 28 (2d Cir. 2014) (finding "[e]ven if plaintiff was not capable of performing one of the three examples of unskilled jobs cited by the Vocational Expert[,]" the ALJ could rely on testimony regarding "her ability to perform the other two jobs" in the national economy); *cf. Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (holding at Step Five that the "Commissioner need show only one job existing in the national economy that [plaintiff] can perform") (summary order). The ALJ thus did not commit reversible error in relying

32

on VE Maxim's testimony even though the ALJ did not elicit an explanation on the record regarding VE Maxim's characterization of sandwich making as light exertional work.

**D.      Whether the ALJ Properly Considered Plaintiff's Full-Time Position in His Disability Determination.**

From approximately March 1, 2017 through the date of the ALJ hearing, Plaintiff worked full-time (thirty-six to forty-eight hours per week) for Soundview Paper as a packager. Plaintiff argues that the ALJ erred in determining that her work at Soundview Paper was substantial gainful activity because this activity constitutes trial work, which cannot be used as evidence of lack of disability.

Trial work is "a period during which [a claimant] may test [his or her] ability to work and still be considered disabled." 20 C.F.R. § 404.1592(a). The trial work period begins "with the month in which [the claimant] become[s] entitled to disability insurance benefits" and ends after nine months. 20 C.F.R. § 404.1592(e). Any work done during the trial period "shall be deemed not to have been rendered by [an] individual in determining whether [her] disability has ceased in a month during such period." *Stanton v. Astrue*, 370 F. App'x 231, 235 (2d Cir. 2010) (emphasis omitted) (quoting 42 U.S.C. § 422(c)(2)) (summary order).

ALJ Malvey determined that Plaintiff's work at Soundview Paper could not be considered trial work because "a trial work period cannot begin until after an individual is found to be disabled." (AR 13.) This conclusion was not in error. The SSA "permits *recipients of disability insurance benefits* to retain their disabled status while they test their ability to work during a nine-month 'trial work period' that commences the month in which the recipient becomes entitled to benefits." *Conley v. Bowen*, 859 F.2d 261, 262 (2d Cir. 1988) (emphasis supplied) (footnote omitted) (citing 42 U.S.C. § 422(c)); *see also Allen v. Apfel*, 3 F. App'x 254, 258 (6th Cir. 2001) (per curiam) ("[T]he trial work period provided for in § 404.1592 was designed to permit a claimant, *already deemed disabled*, to test his ability to work and still be considered disabled.") (emphasis supplied). Consistent with this requirement, "a 'trial work period' only applies after a

33

person has been adjudged disabled, in order to permit efforts to resume work without jeopardizing benefits if the effort failed." *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).[11]

Because the ALJ found Plaintiff was not disabled, the ALJ did not misinterpret the trial work regulations and could consider Plaintiff's full-time work at Soundview Paper beginning in March of 2017 in determining whether Plaintiff was disabled. *See Stanton*, 370 F. App'x at 235 ("Whatever arguments might be advanced for encouraging trial work periods by persons uncertain as to their disability status, until Congress provides otherwise, we identify no error in an ALJ considering evidence of work activity in deciding an initial disability claim.").

## E. Whether the ALJ Erred in Not Accepting Plaintiff's Post-Hearing Briefing.

Plaintiff contends that ALJ Malvey erred in declining to accept her post-hearing briefing submitted on May 15, 2017, three days after the ALJ's hearing. Plaintiff argues that pursuant to the Hearings, Appeals, and Litigation ("HALLEX") manual section I-2-6-78, the ALJ was required to offer her the opportunity to make final oral arguments and "had no authority upon which to exclude . . . Plaintiff's post[-]hearing memorandum." (Doc. 12 at 16.) The Commissioner counters that ALJs have discretion to permit or deny the submission of post-hearing arguments and memoranda.

HALLEX I-2-6-78 provides procedural guidance on the closing of the ALJ hearing and states that prior to closing, an ALJ will: (1) "[e]nsure that the claimant and any representative have indicated, at any time during the hearing, that there is no additional evidence to submit or disclose to the ALJ"; (2) "[d]etermine that no additional evidence is needed"; (3) "[a]dvise the claimant and any representative that he or she will issue a written decision setting forth the findings of fact and the conclusions of law"; and

---

[11] In *Barnhart v. Walton*, 535 U.S. 212, 223 (2002), the Supreme Court clarified the definition of "trial work" by holding that the SSA lawfully issued an enforceable regulation stating a claimant is not entitled to a trial work period if "you perform work . . . within 12 months of the onset of the impairment(s) . . . *and before* the date of *any* notice of determination or *decision finding . . . you . . . disabled.*" *Id.* (alterations and emphasis in original) (internal quotation marks omitted) (quoting 20 C.F.R. § 404.1592(d)(2)).

(4) "[s]tate on the record that the hearing and record are closed." HALLEX I-2-6-78, Soc. Sec. Admin. (Nov. 20, 2018), https://www.ssa.gov/OP_Home/hallex/I-02/I-2-6-78.html. If the claimant or any representative indicates there is more evidence to submit, the ALJ must determine whether to leave the record open for the submission of the evidence and for how long. *See id.*

At the hearing, ALJ Malvey left open the record for ten days to allow Plaintiff to submit additional medical records from Ms. Scarlett and treating medical provider Stephanie Mathew, D.O., which Plaintiff represented she had requested but had not yet received. Plaintiff submitted Ms. Scarlett's May 11, 2017 Medical Source Statement by that deadline, and ALJ Malvey admitted it into evidence. Plaintiff's representative did not request additional time to submit a post-hearing brief, and Plaintiff makes no argument to the contrary before this court.

Neither SSA regulations nor HALLEX I-2-6-78 compel ALJ Malvey to accept Plaintiff's post-hearing memorandum. Whether the SSA regulations expressly limit the submission of *pre*-hearing memoranda has no bearing on the ALJ's authority to exclude *post*-hearing memoranda. ALJ Malvey thus acted within his discretion in declining to accept Plaintiff's post-hearing memorandum. Plaintiff was free to raise any arguments she could have made to the ALJ in this appeal and appears to have done so.

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for remand to the Appeals Council (Doc. 22), DENIES Plaintiff's motion for a judgment reversing the Commissioner (Doc. 12), and GRANTS the Commissioner's motion to affirm. (Doc. 18.) SO ORDERED.

Dated at Burlington, in the District of Vermont, this $\it{11}^{th}$ day of August, 2020.

Christina Reiss, District Judge
United States District Court